## Apollonia Warth, trading as Albin Warth, v. L. Loewenstein & Sons, a corporation.

### Gen. No. 11,950.

1. ROYALTIES—*when obligation to pay, may be terminated.* Where a contract confers upon the licensee the right to return the patented article upon payment of royalties accrued at the time of such return, and thereby to terminate the obligation to pay future royalties, the licensee may by such action terminate such liability, notwithstanding the breach of a concurrent and collateral undertaking providing that in the event of making such a return, the licensee should not use any other like machine during the life of the patents under which it was constructed.

2. INSTRUCTIONS—*estoppel to complain of.* A party cannot complain of vices contained in instructions where such vices are likewise contained in instructions given by the court at his instance.

3. WITNESS—*competent to show unavoidable absence of.* It is competent for a party to show the unavoidable absence of a material witness not produced by him.

4. EXHIBIT—*when competent to permit jury to take.* It is competent to permit the jury to take with them upon retirement an exhibit, notwithstanding it may contain an immaterial memorandum which has by the ruling of the court been excluded.

5. CONTRACT—*when not in restraint of trade.* A royalty contract

is not in restraint of trade by which the licensee agrees that in the event of his terminating his obligation to pay royalties as therein provided, he will not, for the life of the patents covering the machine which he is licensed to use, employ in his business any other like machine.

6. DEPOSITIONS—*when order suppressing, may be set aside.* Where the formal errors in the *jurat*, certificate, etc., which resulted in an order suppressing depositions, have been amended, it is proper to set aside the order suppressing the same.

7. COSTS—*when ·properly taxed against plaintiff.* The taxation of costs against the plaintiff is proper notwithstanding the issues were found for the ·plaintiff, where it appears that a tender of the ‚amount found against the defendant was made and refused, even though such tender was not strictly formal but was objected to upon no other ground than insufficiency of amount.

Action of assumpsit. Appeal from the Circuit Court of Cook County; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed May 29, 1905.

**Statement by the Court.**   This is an appeal by the plaintiff below from a judgment of the Circuit Court in her favor against the appellee (which was defendant below) for $87.50 damages, which judgment taxed the costs of the proceeding in that court against the plaintiff.

The judgment was rendered on the verdict of a jury. Inasmuch as the defendant admitted an indebtedness of $87.50 to the plaintiff, the verdict was in effect, although not in form, a finding in favor of the defendant on the issues which were tried.

The appellant (plaintiff below) is a manufacturer of cloth-cutting machines, residing in Stapleton, New York; the appellee (the defendant below), a corporation manufacturing and selling men's clothing in Chicago.

The suit was brought in February, 1900. In April, 1902, an amended declaration was filed by the plaintiff (afterwards restored *nunc pro tunc* in March, 1904) containing four counts.

The first count alleged that in April, 1895, the plaintiff, at the request of the defendant, "licensed, let and delivered to use" to the defendant a patented cutting machine for cut-

ting cloth, constructed under many described patents of the United States belonging to her, under "licenses, terms and conditions" which the count sets up in full. Said license is dated April 2, 1895, and is signed by "Albin Warth" (under which name the plaintiff was doing business), but not by L. Loewenstein & Sons. It purports for the consideration of $600 and "upon the terms and conditions and payment of royalty as hereinafter set forth," to license L. Loewenstein & Sons to use in the business of clothing manufacturing the machine in question, "marked D, numbered 154, and of one and one-half inch cutting capacity."

The conditions, besides usual provisions in such licenses not in question here, are that the licensees shall pay the licensor the $600 before mentioned on demand and semi-annual royalties of $150 on the second days of October and April in each year, "until each of the patents herein named have run out." There is, however, in the license, the following condition:

"The said licensees may terminate the payment of royalty herein mentioned upon the condition that the aforesaid machine shall be returned and delivered to said licensor by the said licensees with payment of royalty up to the date of such return, and upon the further condition, and the said licensees agree that they will not thereafter use or authorize or allow to be used directly or indirectly in their business or elsewhere, any other cloth cutting machine until all the patents herein mentioned shall have run out."

The count, after setting out in *haec verba* the alleged license, declares that the defendant paid the three first semi-annual royalties becoming due respectively on October 2, 1895, April 2, 1896, and October 2, 1896, but did not pay those thereafter becoming due, "although the said defendant never did prior to the commencement of this suit, return the said machine with payments of royalties up to the date of such return. Whereby, etc., the plaintiff has suffered damage."

The second count alleges simply that in April, 1895, the plaintiff delivered to the defendant and licensed the defend-

ant to use a certain patented cutting machine known as D. No. 154, constructed under the patents numbered and dated as set out in the first count, from April 2, 1895, to the expiration of said patents, provided that the defendant made the payment of royalties and "upon the condition that the said machine should be returned and delivered to the plaintiff by the defendant with the payment of royalties up to the date of such return, and upon the further condition that it further agreed that it would not thereafter use or authorize or allow to be used directly or indirectly in their business or elsewhere any other cloth cutting machine until all the said patents should have run out and expired," and that in consideration of such delivery and license the defendant promised the plaintiff to take good care of the machine, and to pay to the plaintiff semi-annually royalties of $150 on October 2 and April 2 in each year, but failed to pay the royalty due on April 2, 1897, and thereafter.

The third count is one in *indebitatus assumpsit*, "for the use and hire of a certain patented cutting machine, and for royalty on said machine for the use thereof."

The fourth count is an allegation that plaintiff let to the defendant for five years a certain patented cutting machine, and that defendant promised to pay the plaintiff what the use of it was reasonably worth, and that for said time the use and hire of the machine were reasonably worth $1,000.

To this declaration the defendant pleaded the general issue, verified by affidavit, and also the Statute of Frauds, alleging in the latter plea that the supposed agreement of April 2, 1895, was not to be performed within one year from its date, and that no note of it in writing was signed by the defendant.

To the plea of the Statute of Frauds the plaintiff interposed a general and special demurrer, which demurrer was sustained by the court, the action of which in this regard is assigned in this court as a cross-error.

The plaintiff, during the pendency of the suit, took the depositions of Apollonia Warth, Henry Warth and Charles F. Warth. A motion was made by the defendant and

granted 'by the court to suppress the same. Afterward the captions, jurats and certificates of the commissioner taking the said depositions having been amended, the order suppressing the depositions was vacated, and as amended they were restored to the files. To this action the defendant excepted. Charles F. Warth was produced by the plaintiff as a witness, and testified at the trial. The depositions of Apollonia Warth and Henry Warth were allowed by the court, over the objections of the defendant, to be read to the jury, and to this action of the court the defendant excepted, and it is assigned as a cross-error.

November 10, 1903, the cause was by stipulation and under the rules of court, in pursuance of such a stipulation, passed to be taken upon ten days' notice. In pursuance to notice provided for by said stipulation, the cause was placed on the trial calendar in March,. 1904. A motion was made by the defendant to secure a continuance of said cause on account of the absence from the city and country for his health, as it was alleged, of Emanuel Loewenstein, the president of the defendant company, and claimed to be an important witness for it. This motion was denied ·by the court, and the cause was brought to trial before a jury on March 9, 1904, and the trial lasted for several days.

The bill of exceptions shows that counsel for plaintiff stated to the court, before the offer of evidence, that the plaintiff was not seeking to recover upon a written contract, but upon an unwritten contract.

The plaintiff introduced evidence in the deposition of Henry Warth of a conversation between the said Henry Warth, as agent for the plaintiff, and Emanuel Loewenstein, the president of the defendant corporation, on or before February 25, 1895, in which (Mr. Warth testified) Emanuel Loewenstein asked the terms for one of plaintiff's machines, and was told by Warth that he would put everything in writing and submit it. At that time defendant, which had taken over the business of a partnership of the same name, was using, under a written license executed by plaintiff and that partnership, one of plaintiff's machines known as No. 40 B.

cutting machine. Mr. Warth testified that in pursuance of the statement by him that "he would put everything in writing and submit it," he prepared in duplicate and delivered to Emanuel Loewenstein the following paper:

"Chicago, Feb. 25, 1895.

It is hereby agreed between Albin Warth, of Stapleton, New York, and L. Loewenstein & Sons, of Chicago, Ill., as follows, to-wit:

The said Warth is to furnish the said L. Loewenstein & Sons with one hundred and twenty feet of overhead track which has been formerly used by Messrs. Goldsmith & Stern of this city, and which said Warth is to erect over a set of three tables (so much thereof as necessary) with a new latest improved overhead carriage and cutting head of one and one-half inch cutting capacity (the said latest improved overhead carriage is furnished as an exchange of certain machine B. No. 46, formerly owned by Strauss, Yorndorf & Rose, and which said L. L. & Sons intended to purchase), for the sum of three hundred dollars ($300) the said machine being subject to a semi-annual royalty of one hundred and fifty dollars ($150) under the terms, conditions and provisions of a license to be the same form as their present form of license for a certain machine, B. No. 40, with the exception that said license is to contain the additional patents up to February 16, 1892.

It is also agreed in consideration of the foregoing to use so much of said overhead track, with one overhead carriage (being the carriage of machine B. No. 46 formerly used by Strauss, Yorndorf & Rose, as herein referred to), so as to operate their present machine, B. No. 40 (overhead) over a table not to exceed twenty-one (21) feet in length, and which said Warth is also to erect with necessary shafting for transmission of power from engine to said new machine, as well as to the present machine B. No. 40, arranged overhead as herein stated. The engine to be located and the necessary tables and linoleum to be furnished and put up in such man-

ner as the said machines may require at the cost and charges of the said L. L. & Sons.

It is also agreed between the parties hereto, in the event should the said L. L. & Sons decide to and do return their present machine B. No. 40 (in order to terminate the royalty) within six months from date said new machine is put up, that they shall then only be released from payment of the royalty of said six months, with the privilege to extend said first six months, but should the machine B. No. 40 not be returned after the expiration of the first or second six months, the royalty will continue as if this understanding did not exist.

It is also further agreed should the said Warth complete further improvements which he has under contemplation of making, the said L. L. & Sons shall be entitled to same if they elect, without any cash consideration except that the royalty is to be extended for such additional patents therefor, but in no case shall the royalty exceed one hundred and fifty dollars semi-annually.

The said new machine is to be erected about April 1, 1895.

ALBIN WARTH,<br>Per Henry Warth."

Mr. Warth further testified that he and Mr. Loewenstein then went over this writing, and Loewenstein "said it would be all right, and I signed the same and he was going to sign it, too, and he said, 'Do you want me to sign it?' and I said, 'No, it is not necessary. After the machine is finished and erected then I will send you on the license paper in triplicate which will correspond with Exhibit No. 5, and you sign these written ones and return two to me,' and he said, 'All right, I will do that.'" By Exhibit No. 5 the witness evidently meant Exhibit No. 5 in the present case, which was the writing of February 25, above set forth in full. It does not appear otherwise than as quoted how the witness actually described it in his conversation, but he had testified that it was then before them.

"The present form of license for a certain machine B. No.

40," referred to therein, is claimed by appellant to be shown
by the license produced by them in evidence as plaintiff's
Exhibit 4, made by "Albin Warth" to "Leopold Loewenstein,
Emanuel Loewenstein and Sidney Loewenstein, copartners
as L. Loewenstein & Sons." It is for the use of a cutting
machine marked B. numbered 40, but is, otherwise than as
to amount of consideration and payments, dates, the name of
licensee and description of machine, exactly the same (above
the signature of Albin Warth) as the instrument set up in
the first count of the plaintiff's declaration and before de-
scribed. It contains the same condition as that quoted in
full in this statement from that instrument.

The witness Henry Warth further testified that there-
after he delivered to the defendant corporation "the machine,
all the necessary running gear, and overhead tracks, shaft-
ings and pulleys, and erected the machine in their place of
business in Chicago" and left it there in working order.

September 17, 1895, Henry Warth, for the plaintiff, wrote
to the defendant and enclosed what he termed in the letter
a "license paper for cutting machine D No. 154, License No.
166 D " in triplicate, asking the defendant corporation to
sign the same, retain one copy and return the others. He
also enclosed the following bill:

"Stapleton, New York, Sept. 17, 1895.
Messrs. L. Loewenstein & Sons, Chicago, Ill.:
              To Albin Warth, Dr.
              Manufacturer and Inventor.
    Albin Warth,
Zuschneidemachinen.                        Albin Warth,
                                     Machines for Cutting
                                            and
                                     Folding Cloth.
    Office and Factory, Stapleton, S. I., New York.
Mach. D. B.
Miscell. D. B.
Charged on Mach. & Miscel. Acc't. Order Received Feb. 25,
    1895. Terms and Conditions, Dated Febr. 25, 1895.

1895.     Quality.     Size.     No.
March 23.     1     D.     154
License No. 166 D. of Albin Warth's

| | | |
|---|---|---|
| Latest Improved Over-Head Aluminum Machine One and half inch capacity. | Patent Travelling Cloth'g Cutt'g Mach. Overhead Carriage with Sundries, Notch'g Mach. No. 266, subject to a Semi-Annual royalty of $150.00/100 as per subjoined License No. 166 D, dated April 2d, '95. | 600.00 |

Allowance.    The said machine being furnished in exchange of a certain machine B. No. 46 as per endorsement on above license ................. ..................|450.00   150.00

120 feet patented overhead double track with necessary iron frame work for supporting the same, formerly used by Morris Goldsmith & Stern, painting and erecting same to operate over a length of three tables in connection with the above machine D No. 154, and over a length of one table with overhead carriage of the said old machine B No. 46, so as to operate their present machine B No. 40 overhead.

Also with necessary shaftings, pulleys and hangers for transmission of power from engine to said machines D No. 154 and B No. 40......................    150.00

The above 120 feet overhead double track, etc., etc., and the shaftings, etc., etc., form and are part of the above machines

D. No. 154 and License No. 166 D.
Net ........................... ....................        300.00
Credit April, '95.   Paid Hy. Warth on
  acc't........  .............  .......$100.00
All claims must be paid on receipt of goods."

A copy of the "license paper" was introduced in evidence as plaintiff's exhibit No. 8, and a copy of the bill as plaintiff's exhibit No. 7. Exhibit No. 8 is the instrument recited in the first count of the plaintiff's declaration before set forth. Immediately on receipt of the letter of September 17 with its enclosures, the defendant corporation wrote the following letter to the plaintiff:

"Chicago, Sept. 19, 1895.
Mr. Albin Warth, Stapleton, N. Y.

Dear Sir: We are in receipt of yours of the 17th with several inclosures. In reference to same, would say that we will not sign any such contract as you inclose. We are willing to keep your machine at the specified rental, but would not bind ourselves to the various restrictions contained within your printed form.

Trusting that you may arrange this to meet our views, we remain,
                    Yours truly,
                        L. LOEWENSTEIN & SONS."

To this plaintiff rejoined on September 21, asserting that the defendant had agreed to the terms contained in the license paper, and demanding that it be signed. The defendant answered, "We have not entered into any contract binding upon us. We will do what we proposed in our letter of the 19th, and no more. Should this not be satisfactory to you, the machine is here at your disposal, and you may remove the same whenever you see fit." Plaintiff replied, simply referring again to letter of September 21. Receiving no reply, plaintiff on November 6, 1895, sent to defendant another statement of account, showing a balance of $200 due and drew for the same. The draft came back to plain-

tiff unpaid, and November 29, the plaintiff drew again for $200, and wrote a letter to defendant expressing the hope that the draft would be promptly paid. This draft was also returned unpaid, defendant writing that the failure to pay it was due to the "reasons that we put forth in our previous letters," which "we had hoped . . . would have fully explained the position."

Plaintiff then wrote to defendant the following letter:

"Stapleton, New York, December 10, 1895.
Messrs. L. Loewenstein & Sons, Chicago, Ill.

Gentlemen: Yours of the 3rd inst. received. The reason stated in your above mentioned letter for the purpose to evade your just obligations to which you have fully agreed, as per contract of Febr. 25, '95, which you hold in writing and under which the machine was furnished and erected.

I cannot take notice of any of your propositions following six months after carrying out of the agreement. I am entitled to the payment of the $200.00 for which I have drawn upon you (being balance due on bill rendered Sept. 17, '95). I may state right here, should you not pay this bill at an early date I shall be obliged to use legal means for its collection, as I am much surprised to find a concern like yours to resort to such means as you do, to evade your just obligations.

Yours truly,
ALBIN WARTH,
per Henry Warth."

December 23, 1895, the defendant wrote plaintiff as follows:

"Mr. Albin Warth, Stapleton.

D. Sir: We inclose check for $200.00 in payment of bill rend.

Yours truly,
L. LOEWENSTEIN & SONS."

To this, under date of December 26, 1895, the plaintiff

6

replied, acknowledging "yours of 23rd inst." with check "in settlement of machine bill rendered September 17th, 1895."

(Note: When this letter was introduced in evidence by the plaintiff it bore a pencil memorandum of the defendant, "Favor of the 23rd inst. above referred to is our simple 'form' of remittance." Plaintiff having excluded this from the offer of the letter, defendant seems to have offered it. Objection was made to it by the plaintiff and the objection was sustained. The jury took to their room when they retired this exhibit, bearing the said pencil memorandum. This is one of the alleged errors assigned by the appellant.)

This letter inclosed a receipt for "machine & miscel. bill September 17, '95, for machine D No. 154, license No. 166 D New York."

It appeared in the evidence also that the plaintiff by her agents drew for $150 on the defendant on October 2, 1895, April 2, 1896, and October 2, 1896, and notified defendant each time that the draft was "for semi-annual royalty due on your Albin Warth cutting machine, size D No. 154." Each draft was paid apparently on presentation. January 14, 1897, the defendant wrote the plaintiff the following letter, with inclosures as noted in the reply of the plaintiff next given:

"Chicago, January 14th, 1897:
Mr. Albin Warth, Stapleton, Staten Island, New York.

Dear Sir: We herewith hand you bill of lading for cutting machine 'D 154,' also check in full for rent to date. We have no further use for this machine.
Yours very truly,
L. LOEWENSTEIN & SONS."

To this the plaintiff replied:

"Stapleton, New York, January 21, 1897.
Messrs. L. Loewenstein & Sons, Market and Quincy Sts., Chicago, Ill.

Gentlemen: Your letter of the 14th inst. with your check

for $87.50 and bill of lading received in due course. In reply I beg to say that I cannot accept such check and bill of lading upon the conditions stated in your said letter. I therefore herewith return your check for $87.50, dated Jan'y 14, '97, No. 2584, on the Mechanics' and Traders' Bank, New York City, and the B. & O. bill of lading, dated Jan'y 14, '97, for one (1) case hardware, weight 170 lbs. If you desire to terminate the payment of royalty on Machine 'D No. 154,' you can only do so under the terms and conditions of the contract of License No. 166 D, dated April 2d, 1895.

I desire to emphasize the condition that you must agree not to use another machine, from some one else, until all the patents referred to and mentioned in said contract of license shall have run out.

Your obligation to pay royalty continues.

ALBIN WARTH,
per Henry Warth."

There was apparently no further communication between plaintiff and defendant until October 3, 1898, when the plaintiff drew for $600, which draft was returned unpaid with a note attached by defendant, "We do not owe him anything." Thereupon, on November 2, 1898, the plaintiff wrote defendant the following letter, which appears, so far as the record shows, to have closed the correspondence:

"Stapleton, New York, Nov. 2, 1898.
Messrs. L. Loewenstein & Sons, Market and Quincy Sts.,
Chicago, Ill.

Gentlemen: My draft No. 2598, dated October 3, 1898, for $600, has been returned to me unpaid with a note attached written by you, which states, 'We do not owe him anything.' Signed, L. Loewenstein & Co. The said draft of $600, which is for accrued royalty on your cutting machine D No. 154, license No. 166 D, dated April 2, 1895, ought to have been paid by you. The said machine is in your possession and has not been returned and delivered to me as provided for in the said contract of license, see in

particular the seventh clause thereof, which reads as follows: 'If you desire to terminate the payment of royalty on the said machine, it can only be done in accordance with the terms and conditions set forth in said contract of license.' Thus far the said machine has not been returned and delivered to me with the payment of the royalty up to date of such return. The longer you refuse to comply with the conditions of said license, the longer the royalty will continue to become due and payable up to such time that you see fit to do so. I think it very foolish on your part to refuse to comply with the terms and conditions of said contract, if you desire to terminate the payment of the royalty thereunder.

Yours truly,<br>
ALBIN WARTH,<br>
per Henry Warth."

In February, 1900, the present suit was begun by appellant, who claimed the semi-annual royalties of $150 each up to the time of bringing the suit, with interest thereon, bringing up the aggregate amount claimed to be due to over $1,-150.

At the trial besides the depositions of Apollonia and Henry Warth, and documentary evidence including the letters in this statement described and repeated, the plaintiff introduced the testimony of Charles F. Warth, who testified that he was present when the box referred to in the bill of lading, dated January 14, 1897, was opened at Stapleton at the storage house, and that it contained Cutting Head D 154, the overhead carriage and some rail-end pulleys. He also testified that the "overhead track" is what the machine travels on, and "is one of the patents;" and that after the box containing the cutting heads, etc., was sent on to Stapleton, he saw in the defendant's cutting room a 120-foot patent overhead track "described in the bill of September, and belonging to the machine," and the counter shaft and hangers. He said also that the "notching machine" mentioned in the bill of September 17th, was a part of machine D 154, and that it was not returned "to his knowledge," and that at the time

of this visit to the defendant's rooms he saw a cutting machine, not of the Albin Warth make—an electric machine—in operation.  Over plaintiff's objection he was asked on cross-examination and required to answer whether his deposition was not taken and signed at the same time as that of his brother, Henry F. Warth.

The defendant offered as evidence the testimony of Doctor Schmid, a physician, that Emanuel Loewenstein was in bad health in 1903, and was advised by him to go away and remain away from Chicago; the testimony of Sidney Loewenstein, that his brother Emanuel, who alone had attended to the hiring of the Warth cutting machine, left Chicago November 13, 1903, on account of poor health, and was in Wies Baden, Germany; and the depositions of Michael Driscol, who was in January, 1897, freight agent at Stapleton for the Staten Island Rapid Transit Co.; and of Edward C. Meurer, at that time in business at Stapleton, who, by their testimony showed that a case of hardware weighing 170 pounds, about 3 feet long, 2 wide, and 10 inches high, consigned by L. Loewenstein & Sons to Albin Warth, Stapleton, N. Y., was received by the Staten Island Rapid Transit Company, was refused by Henry Warth, and placed on March 26, 1897, at the storage rooms of Edward C. Meurer, in Stapleton, where it still remained, and where in February, 1902, Henry Warth and Charles Warth called and examined its markings and contents.  They had about a year before called to know if there was such a case there for storage, and these were the only conversations had at any time by Meurer with any representative of the plaintiff.

During the defendant's case the appellee tendered $87.50 in gold to appellant, which tender was declined by the appellant waiving "any technical point."  Appellee's counsel then requested the court to make an order that the clerk should retain the $87.50 in gold coin of the United States, which defendant deposited with him "for the sole purpose of paying the amount of the check" for that amount, sent by defendant to the plaintiff, but returned by her.

The court refused in their original form two instructions

offered by the plaintiff, and after modifying them gave them as modified. It gave five instructions offered by the defendant and refused fifteen.

After the jury had returned their verdict for $87.50 in favor of the plaintiff, the plaintiff made a motion for a new trial, which was denied. A motion in arrest of judgment was also denied, and the judgment now appealed from was given. In this court the plaintiff has made fourteen assignments of error. Those argued, however, are only that the verdict and judgment were against the weight of and contrary to the evidence; that certain evidence was improperly admitted; that certain evidence was improperly excluded; that the jury were erroneously permitted to take an exhibit with a certain notation on it which was not in evidence, into the jury room, and that two of the instructions given for the defendant were erroneous.

HELMER, MOULTON & WHITMAN, for appellant.

NEWMAN, NORTHRUP, LEVINSON & BECKER, HARRY GOODMAN and C. E. CLEVELAND, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

It would serve no good purpose for us to discuss at length all the interesting questions raised by the facts set forth in the statement prefixed to this opinion and argued in the elaborate briefs filed on each side of this controversy.

The jury found a verdict which was in favor of the defendant on the matters contested on the trial between the plaintiff and defendant, and we are not disposed to disturb the judgment founded on it.

On the main questions involved, we think that an oral contract for the use of machine D 154, with terms and conditions such as were embodied in the license from the plaintiff to the copartnership of L. Loewenstein & Sons, of machine B No. 40, may be assumed to be proved to have been made between the plaintiff and the defendant (the corporation L. Loewenstein & Sons), as claimed by the plaintiff,

without rendering the verdict so clearly against the weight of the evidence that it must be interfered with by us.

The claim of appellee, as we understand it, is that no such contract was proved; that, on the contrary, the testimony of Henry Warth in connection with the correspondence introduced would have warranted the jury in finding that there was merely an agreement to sign a license contract in the future with terms which, to be binding, must receive such subsequent assent or signature of the parties, or that at best, if the oral agreement was more precise than this, and was to sign a specific license contract, such agreement was broken, and that it was only an action for such a breach, and not an action for royalties like the present, which accrued to the plaintiff.

We are of the opinion that the evidence offered by the plaintiff, showing, in addition to the statement of Mr. Warth, the fact that the defendant kept and used the machine after the contention of the plaintiff that it was bound by the terms of the proposed license agreement was plainly made known to it, and the further fact that it paid a bill according to its tenor, which set forth that contention, sufficiently established the existence of the contract that plaintiff claimed.

But we cannot agree with appellant as to its necessary legal effect.

The seventh clause of the license agreement provided that the licensees might terminate the payment of royalty therein mentioned, upon the condition that the machine should be returned and delivered to said licensor by the licensees with payment of royalty up to date of such return, and "upon the further condition and the said licensees agree that they will not thereafter use or authorize or allow to be used directly or indirectly in their business or elsewhere any other cloth cutting machine until the expiration of the Warth patents." It seems to us that the effect of this last quoted peculiar provision is to make a collateral agreement which went into immediate effect. Such we understand, too, to be the position as to the language used taken in the argument of this appeal by both parties. It did not require, they say, a

*further* agreement at the time of the return of the machine, but constituted by itself (if it was entered into and was valid) an agreement between the parties of the date at which it was agreed to. Assuming this, what is the legal result? Let it be supposed that on January 14, 1897, the defendant had beyond all dispute returned the entire machine D 154 and paid all royalties due to that date, and was not then using any other cutting machine of any kind or nature. Certainly until it did use such another cutting machine there would be no right of action for further royalties under the oral contract of February 25, 1895. The terms of that contract would have been complied with. But suppose that in December, 1907, just before the last Warth patent mentioned in the license expired, the defendant began to use an electric cutting machine. Doubtless plaintiff would then claim that under the agreement of February 25, 1895, an action had accrued to her for a breach of the contract made on that date, and she might perhaps with some plausibility claim (we express no opinion on the validity of such a claim) that the measure of damages for that breach was the aggregate of the royalties she had been deprived of during the intervening years. But could she sue directly under the agreement of February 25, 1895, for the royalties themselves for which from 1897 to 1907 she had had no claim whatever? If she could not (and we think she could not), then in this case the defendant could bring the claim for royalties to an end by a return of the machine with payment of royalties to the date of the return, leaving to the plaintiff her claim, if she had one, for damages for any breach of the collateral agreement to use no other cutting machine during the life of the Warth patents.

We are aware that language (purely *obiter dictum*) in the last paragraph of the opinion of the majority of the court in Warth v. Liebovitz, 179 New York, 200, might seem to militate against this view, but it does not change our confidence in its soundness. We think it would make no difference whether this collateral agreement was immediately broken at the time of returning the machine, or was thereafter

broken, but it may be noted in the case at bar, that it does not appear when the defendant began to use the "electric machine" mentioned in the testimony of Charles F. Warth. It was certainly more than a year after the return of the Warth machine that Charles F. Warth saw it in operation.

The view we take, that the direct obligation to pay royalties could be terminated by the appellee by returning the machine with payment of the accrued royalty to date, would seem to have been taken by the trial judge and by both the plaintiff and defendant below, if we should judge by the instructions II, III and VII. Instruction II (unchanged in this regard) was requested by the plaintiff and despite appellant's ingenious argument to show that it does not state the same doctrine as the instruction III, which was requested by the defendant, we think its purport in the natural use of language is clearly the same.

Appellant complains of instruction III, but we do not see how she could effectively do so, even if it were erroneous, since, in our view, she propounded the same doctrine in instruction II. Sibley Warehouse Co. v. Durand Co., 200 Ill., 354. But we do not think either II or III erroneous. We do not understand, however, why the defendant asked or the trial judge gave instruction VI. It is inconsistent with II and with III. It is more favorable, therefore, to the plaintiff than the theory she herself propounded in her offered instructions, and in our opinion, had it not been requested by the defendant, might have been objected to by it as erroneous and misleading. But it cannot be complained of by appellant.

Under this construction of the contract claimed by appellant to exist, the question to be left to the jury was whether the machine with the royalties due up to that time was at any time returned to her.

The appellee claims that it made such a return on January 14, 1897, and it is admitted that together with the attempted return on that date it paid the balance of the amount of royalties due under the contract at that time. Without discussing in detail the contentions and arguments made by

appellant and appellee in that regard, we will simply say that after a careful consideration of them, we are of opinion that it was a question properly to be left to the jury, whether the action of the appellee on January 14, 1897, was a compliance with the condition of the contract. There was a fair question under the alleged contract and correspondence, in connection with other evidence introduced, by the appellant, whether the "machine" to be returned was not that which appellee forwarded to Stapleton, and whether the appellant did not in effect admit it to be such, by the objection which it made as to the "further agreement" demanded in her letter of January 21, 1897, and her omission, personally, or by her agents, before the suit was brought, to call particular attention to the non-return of that portion of the installed apparatus which she now claims was retained, although it had been observed by her agent to be still in place. The appellant, indeed, by her offered instruction II asked the court to submit this issue to the jury. We do not think that the evidence on this point is such that we can declare it to be clearly inconsistent with the verdict.

The appellant, besides her point on the weight of the evidence and her objections to the instructions III and VII, which we have disposed of, complains of other alleged errors in the trial.

She objects to the admission of evidence that Emanuel Loewenstein left Chicago for Europe before the trial and after the case had been passed on notice, on account of his health and under the advice of a physician, and in connection therewith also objects to instruction IV, as follows:

"The court instructs the jury that they should not draw any inference unfavorable to the defendant from the fact that Emanuel Loewenstein has not appeared as a witness in this case on behalf of the defendant, if from the evidence the jury believe that said Loewenstein is unavoidably absent in Europe at the time of this trial."

We do not think there was error in admitting the evidence or giving the instruction. The law is correctly stated in Jones on Evidence, sec. 17, and in Hope v. West Chicago St.

R. R. Co., 82 Ill. App., 311, and Mantonya v. Reilly, 184 Ill., 183, that "The mere withholding or failing to produce evidence which under the circumstances would be expected to be produced, and which is available, gives rise to a presumption against a party." We think it was proper to allow the introduction of evidence tending to show why, under the circumstances, Emanuel Loewenstein's testimony might not be expected, and to leave it to the jury under the instruction complained of, to say whether he was "unavoidably absent," and to instruct them that if they so found they should not draw an unfavorable inference from the omission of his testimony.

Nor do we see anything injurious to the defendant in the questions which were allowed to be put to and answered by Charles H. Warth in relation to his deposition, or in the fact that the jury were allowed to take Exhibit 22 to the jury room with the pencil memorandum on it which had been excluded from the evidence. The memorandum was immaterial and could not have influenced the jury, who had the "favor of the 23rd" to which it referred before them. And so also was the notation on Exhibit 8, in our view, entirely immaterial. It could not have affected the verdict had it been admitted.

The question of costs has caused us some hesitation, but following the opinion of the Appellate Court for the Third District in Wagner v. Heckenkamp, 84 Ill. App., 323, we are inclined to think that a proper construction of Chapter 135 of the Revised Statutes justified the trial court, although the issues joined on the pleadings were found for the plaintiff, in taxing the costs against the plaintiff. Although in this case, as in that, evidence was lacking that the money was at all times pending the suit in the hands of the clerk of the Circuit Court, yet it does appear in this case, as in that, that the tender was made before suit, that no objection was made to its form, but it was declared as not sufficient in amount—that there was no evidence or suggestion that at any time the plaintiff desired to accept it, and that during the trial "the money was again tendered and refused, after

which it remained with the clerk until the trial was concluded and it still remained unaccepted." We therefore conclude that the judgment should be affirmed as it stands.

The view we take of the case relieves us from the necessity of any decisive consideration of the cross-errors assigned by the appellee, or of the proposition made by counsel that the seventh clause of the "license agreement" would be in any event void as against public policy. We will say, however, that we do not consider the error well assigned which complains of the admission of the depositions of Apollonia Warth and Henry Warth, nor do we think that the seventh clause of the license agreement could be adjudged void as in restraint of trade.

As to the demurrer to the plea of Statute of Frauds, we cannot agree with counsel for appellant that the fact that a corporation may be dissolved within a year brings this case within the reasoning of the opinions cited by them from the Massachusetts courts, where "the full performance of the agreement depended upon the contingency of the life of a party." Peters v. Westborough, 19 Pick. 364; Doyle v. Dixon, 97 Mass., 208. The opinion of Judge McAllister in White v. Murtland, 71 Ill., 250, adverts to the "nice distinction" made by the Supreme Court of Massachusetts between the facts in Peters v. Westborough, 19 Pick., 365, and those in Hill v. Hooper, 1 Gray, 131. We think the case at bar, under the theory of appellant as to the contract, comes rather within the rule laid down by the case of Hill v. Hooper than within that announced in Peters v. Westborough.

But it is not necessary for us to decide whether the demurrer was not in any event properly sustained upon other grounds. As the appellee himself admits, if the view that we take of the contract to pay royalties is a correct one, it was capable of performance within a year.

The judgment of the Circuit Court is affirmed.

*Affirmed.*